UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                        Plaintiff,

    v.

DANIEL CATTLIN,
WILLIAM R. SHUPE

                        Defendants.

Civil Action No. 21-CV-5294-ARR-JRC

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
## FOR DEFAULT JUDGMENT AGAINST DEFENDANT DANIEL CATTLIN

# TABLE OF CONTENTS

PROCEDURAL HISTORY ......................................................................................................... 4

ARGUMENT ............................................................................................................................. 5

   I.    Default Judgment Should be Entered as to Cattlin. ............................................................ 5

      A. Cattlin Violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the
          Exchange Act and Rules 10b-5(a) and (c) thereunder. ............................................ 6

      B. Cattlin Aided and Abetted the Pages' Violations of the Securities Laws. ............................ 8

   II.   The Court Shout Permanently Enjoin Cattlin. ................................................................ 11

   III.  The Evidence Supports the Disgorgement and Prejudgment Interest Requests. ............... 14

      A. Disgorgement and Prejudgment Interest Should be Ordered. ................................................ 14

      B. Cattlin Should Disgorge Proceeds Derived From Illegal Stock Sales. ................................ 15

      C. Cattlin Should Be Ordered to Pay Prejudgment Interest at the IRS Underpayment Rate. 16

   IV.  The Court Should Order Cattlin to Pay a Civil Monetary Penalty of $207,183. ............... 17

   V.   The Court Should Bar Cattlin from Participating in Any Offering of a Penny Stock. ....... 18

   VI.  The Court Should Bar Cattlin from Serving as an Officer or Director of a Public
   Company. .................................................................................................................. 21

CONCLUSION ..................................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Aaron v. S.E.C.*, 446 U.S. 680 (1980) ......................................................................................... 6, 7

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ......................................................................... 6

*Finkel v. Romanowicz*, 577 F.3d 79 (2d Cir. 2009). ................................................................... 5, 6

*Liu v. S.E.C.,* 140 S. Ct. 1936 (2020). ........................................................................................ 14

*S.E.C. v. Amerindo Invest. Advisors, Inc.*, No. 05-cv-5231, 2014 WL 2112032 (S.D.N.Y. May 6,
   2014) ...................................................................................................................................... 14

*S.E.C. v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ............................................................................. 9

*S.E.C. v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) ....................................................................... 12

*S.E.C. v. China Northeast Petroleum Holdings Ltd.,* 27 F. Supp. 3d 379 (S.D.N.Y. 2014) .......... 6

*S.E.C. v. Cobalt Multifamily Investors I, LLC*, No. 06-CV-2360, 2011 WL 4889093 (S.D.N.Y.
   Oct. 13, 2011) ....................................................................................................................... 12

*S.E.C. v. Contorinis*, 743 F.3d 296 (2d Cir. 2014) ...................................................................... 14

*S.E.C. v. Contrarian Press, LLC*, No 2019 WL 1172268 (S.D.N.Y. Mar. 13, 2019) .................. 10

*S.E.C. v. DiBella*, 587 F.3d 553 (2d Cir. 2009) ...................................................................... 9, 18

*S.E.C. v. Fiore*, 416 F. Supp. 3d 306 (2019) ................................................................................. 7

*S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450 (2d Cir. 1996) .................................... 6, 8, 12, 15

*S.E.C. v. Fowler*, 6 F.4th 255, 265 (2d Cir. 2021) ...................................................................... 14

*S.E.C. v. Lee*, 720 F. Supp. 2d 305 (S.D.N.Y. 2010) .................................................................... 7

*S.E.C. v. Lek Sec. Corp.*, No. 17-cv-1789 (DLC), 2020 WL 1316911 (S.D.N.Y. Mar. 20, 2020) 16

*S.E.C. v. McNulty*, 137 F.3d 732 (2d Cir. 1998) ........................................................................... 7

*S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295 (2d Cir. 1999) ................................................... 6
*S.E.C. v. Patel*, 61 F.3d 137 (2d Cir. 1995) ................................................................... 15, 19, 21
*S.E.C. v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279 (2d Cir. 2013) .......................................... 7
*S.E.C. v. Rinfret*, No. 19 Civ. 6037 (AJN), 2020 WL 6559411 (S.D.N.Y. Nov. 9, 2020). ............ 5
*S.E.C. v. Shkreli*, No. 15-cv-7175 (KAM), 2022 WL 541792 (E.D.N.Y. Feb. 23, 2022) ............ 21
*S.E.C. v. Tome*, 833 F.2d 1086 (2d Cir. 1987) ................................................................ 15
*S.E.C. v. Universal Exp., Inc.*, 475 F. Supp. 2d 412 (S.D.N.Y. 2007) .................................... 19
*S.E.C. v. Verdiramo,* No. 10 Civ. 1888, 2013 WL 57823 (S.D.N.Y. Jan. 7, 2013) ..................... 18
*S.E.C. v. Wey*, 246 F. Supp. 3d 894 (S.D.N.Y. 2017) ..................................................... 8
*Smith v. S.E.C.,* 653 F.3d 121 (2d Cir. 2011) ................................................................. 11

Statutes

15 U.S.C. §§77t(d)(2)(C); 78u(d)(3)(B)(ii) ................................................................ 17
15 U.S.C. §77t(d); 78u(d)(3) ................................................................................. 17
15 U.S.C. §§77t(g)(2); 78u(d)(6)(B) ....................................................................... 18
15 U.S.C. §§78u(d)(5), and (d)(7) .......................................................................... 14
15 U.S.C. §77t(b) ............................................................................................. 11
15 U.S.C. §78c(a)(51) ....................................................................................... 19
15 U.S.C. §78t(e) ............................................................................................. 8
15 U.S.C. §78u(d)(1) ........................................................................................ 11
15 U.S.C. §78u(d)(2) ........................................................................................ 21
17 C.F.R. §201.1001(b) ..................................................................................... 17
17 C.F.R. §240.10b-5(a), (c) ............................................................................... 6

Plaintiff Securities and Exchange Commission ("Commission") submits this memorandum of law in support of its motion for a default judgment against defendant Daniel Cattlin ("Cattlin"). From early 2019 to at least 2020 Cattlin schemed with co-defendant William Shupe ("Shupe"), and Timothy and Trevor Page to help the Pages acquire millions of shares in two U.S. publicly traded microcap companies, disguise their control over the companies, and then dump their shares into public markets in violation of the securities laws. As CEO of the two microcap companies, BioHemp International, Inc. ("BioHemp")[1] and Cyberfort Software Inc. ("Cyberfort"), Cattlin helped the Pages consolidate control over the companies through numerous corporate actions, and assisted them in disguising their control by omitting their names from required disclosures. Through these actions, Cattlin violated Sections 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5(a) and (c) thereunder and aided and abetted violations of the same statutes by Timothy and Trevor Page.

## PROCEDURAL HISTORY

The Commission filed its Complaint in this action on September 23, 2021. *See* Dkt. No. 1. Daniel Cattlin resides in the United Kingdom. On November 12, 2021, the Complaint and Summons, in addition to other documents in this case, were served personally through the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Service Convention") on defendant Cattlin in the United

---

[1] In June 2019, Blake Insomnia Therapeutics, Inc. ("Blake") changed its name to BioHemp and purportedly became a distributor of cannabidinol products. *See* Dkt. No. 1, Complaint, ¶¶16, 76. In this memo, term "BioHemp" refers to the company under both of its names.

Kingdom, and proof of service was filed on April 29, 2022. Dkt. No. 17. The Summons required Cattlin to file his answer or otherwise respond to the Complaint within twenty-one days of service, or by December 3, 2021. Dkt. No. 17.

On May 5, 2022, the Clerk of the Court issued a Certificate of Default as to defendant Cattlin. Dkt. No. 20. A Final Judgment as to Shupe was entered on April 28, 2022. Dkt. No. 16. Accordingly, there is no reason to delay entering a default judgment against Cattlin. The Commission seeks five forms of relief against Cattlin – permanent injunctions against future securities fraud violations, disgorgement of ill-gotten gains with interest, civil monetary penalties, and penny stock and officer and director bars.

## ARGUMENT

**I.      Default Judgment Should be Entered as to Cattlin.**

"Federal Rule of Civil Procedure 55 sets out a two-step procedure to be followed for the entry of judgment against a party who fails to defend: the entry of a default, and the entry of a default judgment." *S.E.C. v. Rinfret*, No. 19 Civ. 6037 (AJN), 2020 WL 6559411, at *2 (S.D.N.Y. Nov. 9, 2020). "The first step, entry of a default, simply formalizes a judicial recognition that a defendant has, through its failure to defend the action, admitted liability to the plaintiff." *Id.* (internal quotations omitted). "The second step, entry of a default judgment, converts the defendant's admission of liability into a final judgment that terminates the litigation and awards the plaintiff any relief to which the court decides it is entitled, to the extent permitted by the pleadings." *Id.* at *2 (internal quotations and citation omitted).

Where a defendant has defaulted, "a court is required to accept all of the … factual allegations as true and draw all reasonable inferences in [plaintiff's] favor." *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009). However, a court "is also required to determine

whether the … allegations establish [defendant's] liability as a matter of law." *Id.*, at 84. As set forth below, the allegations of the Complaint establish Cattlin's liability.

### A. Cattlin Violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder.

Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder make it unlawful for any person, in connection with the purchase or sale of any security, "to employ any device, scheme, or artifice to defraud" or "to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. §240.10b-5(a), (c). Similarly, Sections 17(a)(1) and (3) of the Securities Act prohibit "any person in the offer or sale of any securities" to "employ any device, scheme, or artifice to defraud" or to "engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser." The language of these provisions is "expansive" and they "capture a wide range of conduct." *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1101–02 (2019). *Lorenzo* defined the term "device," simply as something "devised, or formed by design," defined a scheme as a "project, plan or program of something to be done," and defined an artifice as "an artful stratagem or trick." *Id.* (internal quotations and citations omitted). The Court similarly defined "act" and "practice" broadly to include things done, actions and deeds. *See id.*

To establish primary liability under these antifraud provisions, the Commission must show that a defendant, acting with scienter, engaged in a fraudulent scheme in connection with the offer, purchase, or sale of securities. *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996); *see also S.E.C. v. China Northeast Petroleum Holdings Ltd.,* 27 F. Supp. 3d 379, 387 (S.D.N.Y. 2014); *S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999). Scienter is "a mental state embracing intent to deceive, manipulate, or defraud," *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976); *Aaron v. S.E.C.*, 446 U.S. 680, 686 n.5 (1980).

Scienter also may be found in circumstances where there has been a "reckless disregard for the truth." *S.E.C. v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998). Scheme liability exists where a defendant's conduct or role in an illegitimate transaction creates a false impression in furtherance of the scheme. *See S.E.C. v. Fiore*, 416 F. Supp. 3d 306, 319 (S.D.N.Y. 2019) (defining manipulative or deceptive acts in the context of Section 10b(a), (c)). The Commission need not plead scienter for a claim under Section 17(a)(3), for which a showing of negligence is sufficient. *See Aaron*, 446 U.S. at 695–96; *S.E.C. v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 285 (2d Cir. 2013). Unlike private litigants, "the SEC is not required to prove investor reliance, loss causation, or damages in an action for securities fraud." *S.E.C. v. Lee,* 720 F. Supp. 2d 305, 325 (S.D.N.Y. 2010).

The allegations of the Complaint establish that Cattlin schemed with the Pages and with co-defendant William Shupe fraudulently to acquire and sell shares in violation of Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder. His scheme included deceptive acts taken in order to defraud investors by disguising the sale of stock held by, or on behalf of, the Pages, who were public company affiliates. With Cattlin's assistance, the Pages secretly obtained control over publicly traded companies BioHemp International, Inc. ("BioHemp")[2] and Cyberfort Software Inc. ("Cyberfort") by acquiring, through various nominee shareholders, a significant percentage of those companies' publicly traded stocks. *See* Dkt. No. 1, ¶¶1, 31, 80-83, 92-95, 100-106, 131-135. Among other acts, Cattlin: (1) as CEO of Cyberfort and BioHemp, took direction from the Pages and acted for their benefit, thereby helping the Pages hide the fact that they controlled

---

[2] In June 2019, Blake Insomnia Therapeutics, Inc. ("Blake") changed its name to BioHemp and purportedly became a distributor of cannabidinol products. *See* Dkt. No. 1, Complaint, ¶¶16, 76. In this memo, I use the term "BioHemp" to refer to the company under both of its names.

those companies, *See* Dkt. No. 1, ¶¶1b, 3, 7, 64, 67-69, 77-78, 88, 93-95, 97-103, 108-125; (2) coordinated with the Pages to provide false and misleading information in response to Commission inquiries, ¶¶7, 71, 73, 79, 136; (3) failed to make the requisite disclosure regarding the Pages' greater than five percent beneficial ownership of BioHemp in the company's 10-K, ¶¶75; (4) oversaw the issuance of stock to various nominee entities controlled by the Pages, ¶¶1b, 72, 77-78, 80-83, 93-95, 97-103, 108-115; and (5) facilitated the Pages' control over Cyberfort's press releases, ¶¶1b, 116-125.  Cattlin's repeated efforts to conceal the role played by the Pages demonstrates that he acted with scienter.  *See, e.g., S.E.C. v. Wey*, 246 F. Supp. 3d 894, 916–17 (S.D.N.Y. 2017) (taking steps to conceal identity of shareholders and lying to third party "creates a strong inference of conscious misbehavior").  As described above, Cattlin knowingly or recklessly engaged in a fraudulent scheme in connection with the offer, purchase, or sale of securities and should therefore be found liable for violation of Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder.  *See, e.g., First Jersey*, 101 F.3d at 1467.

### B.  Cattlin Aided and Abetted the Pages' Violations of the Securities Laws.

Under Exchange Act Section 20(e), "any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this chapter, or of any rule or regulation issued under this chapter, shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided."  15 U.S.C. §78t(e).  To establish liability for aiding and abetting in the context of a securities law violation, the Commission must show (1) the existence of a securities law violation by the primary violator; (2) knowledge or reckless disregard of this violation by the aider and abettor; and (3) substantial assistance by the aider and abettor in the achievement of the primary violation.  *S.E.C. v. Apuzzo*, 689 F.3d 204,

206 (2d Cir. 2012); *id.* at 211 n.6 (noting that Congress amended Section 20(e) in 2010 to include recklessness, not just knowledge, as a basis for aiding-and-abetting liability).

These three requirements cannot be considered in isolation: the knowledge requirement depends on the theory of primary liability, and "there may be a nexus between the degree of [knowledge] and the requirement that the alleged aider and abettor render 'substantial assistance.'" *S.E.C. v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (citing *IIT v. Cornfeld*, 619 F.2d 909, 922 (2d Cir. 1980)). To satisfy the "substantial assistance" element of aiding and abetting, the Commission need not show that a defendant proximately caused the harm on which the primary violation was predicated. *Apuzzo*, 689 F.3d at 213. Rather, the Commission must show that the defendant "associated himself with the venture, participated in it as something that he wished to bring about, and sought by his action to make it succeed." *Id.* at 214.

The allegations of the Complaint establish that Timothy and Trevor Page acquired and sold shares in violation of Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) thereunder. As noted above, the Pages secretly obtained control over three publicly traded companies. *See* Dkt. No. 1, ¶¶1, 31, 80-83, 92-95, 100-106, 131-135. The Pages controlled the operations of BioHemp and Cyberfort through Cattlin, who acted at the Pages' behest to further the fraudulent scheme while allowing the Pages to conceal their control of the companies and dumping of shares through nominee entities. *See id.*, ¶¶ 1, 64, 67-69, 72, 75, 77, 80-83, 100-03, 108-09, 116-125. The Pages dumped their stock into the market and disguised their actions by selling through various nominee entities. *See id.*, ¶¶ 1, 93, 133. The first element of a Section 20(e) violation is thus met -- there was a primary violation by the Pages. *Apuzzo*, 689 F.3d at 206.

Cattlin knowingly or recklessly provided substantial assistance to the Pages' violation of

Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) and Rules 10b-5(a) and (c) under the Exchange Act. Cattlin knew that he operated as the Pages' inside man at Cyberfort and BioHemp and facilitated their secret control of those companies. *See id.*, ¶¶3, 67-69, 72, 75, 80-83, 100-103. Cattlin made payments using a credit card in the name of Tim Page's wife to facilitate BioHemp's filing of public reports required by the Commission. *Id.*, ¶68. Cattlin also facilitated the Pages' fraudulent transfer of stock; to that end, at the request of Trevor Page, he instructed Shupe to sign documents that would be provided to BioHemp's transfer agent so that shares could be promptly reissued. *Id.*, ¶69. Finally, though Cattlin knew that BioHemp was funded by the Pages, he asked the Pages and others how they should respond to Commission inquiries regarding who funded BioHemp, showing he knew that the Pages' intent was to conceal their relationship to the company. *See id.*, ¶71b. The second element of a Section 20(e) violation is thus met – Cattlin knew of or recklessly disregarded the Pages' primary violation. *See, e.g., S.E.C. v. Contrarian Press, LLC*, No 2019 WL 1172268, at *9 (S.D.N.Y. Mar. 13, 2019) ("alleged facts g[a]ve rise to the reasonable inference that [defendant] was aware of … violations" where defendant took steps to conceal fraudulent conduct).

The conduct described above that forms the basis of Cattlin's primary liability is also the means by which he provided "substantial assistance" to the Pages' violations of the securities laws. For example, Cattlin's role was critical to the consolidation of the Pages' control over BioHemp's stock. Cattlin caused BioHemp to execute a 1-for-1,000 reverse split of its stock. Dkt. No. ¶72. Virtually eliminating the BioHemp stock held by small stockholders other than the Pages through this reverse split enabled the Pages to control almost the entirety of the float, the company's purportedly unrestricted stock that was available for trading. *See id.* In March 2019, Cattlin caused BioHemp to issue 25 million restricted shares to a nominee company

controlled by Shupe on behalf of the Pages. *Id.* ¶77. Though BioHemp announced that the issuance was "in preparation of a pending acquisition and investment agreement," this was not true. *Id.* ¶¶77-78. Rather, the purpose was to consolidate the Pages' control over BioHemp and its outstanding stock ahead of dumping over 3 million shares of BioHemp into the market. *Id.* ¶¶78, 92-93. Cattlin took repeated steps which demonstrate that he "wishe[d] to bring about, [and] that he [sought] by his action" to make the Pages' fraudulent schemes succeed. *Apuzzo*¸689 F.3d at 206. The third element of a Section 20(e) violation is thus met – Cattlin substantially assisted the Pages' primary violation. *See, e.g., Wey*, 246 F. Supp. at 928–29 (substantial participation prong sufficiently pled where defendant facilitated corporate actions in furtherance of market manipulation and helped conceal primary violator's control over nominee entities).

## II.     The Court Shout Permanently Enjoin Cattlin.

Under Section 20(b) of the Securities Act and Section 21(d)(1) of the Exchange Act, the Commission should obtain permanent injunctive relief upon a showing that: (1) violations of the securities laws occurred; and (2) there is a reasonable likelihood that violations will occur in the future. *See* 15 U.S.C. §77t(b); 15 U.S.C. §78u(d)(1); *S.E.C. v. Rinfret*, No. 19-cv-6037 (AJN), 2020 WL 6559411, at *4 (S.D.N.Y. Nov. 9, 2020) (citing *S.E.C. v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99–100 (2d Cir. 1978)). Unlike private litigants, the Commission need not show risk of irreparable injury or the unavailability of remedies at law to obtain injunctive relief. *See Smith v. S.E.C.,* 653 F.3d 121, 127 (2d Cir. 2011).

Courts in this circuit typically weigh the following factors when considering whether to enter a permanent injunction in the Commission's enforcement actions: (1) whether the defendant has been found liable for the illegal conduct; (2) the degree of scienter exhibited; (3)

whether the violation was an isolated incident; (4) whether the defendant continues to maintain that his past conduct was blameless; and (5) whether, by reason of his professional occupation, defendant might be in a position that may provide opportunity for further violations. *See S.E.C. v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998); *First Jersey*, 101 F.3d 1450, 1477 (2d Cir. 1996).

Here, as alleged in the Complaint, each of the factors to be considered weighs in favor of a permanent injunction against future violations of the relevant securities law provisions. First, in the context of a default judgment, the Court should accept the Complaint's allegations as true and, relying on the allegations, make findings of fact and conclusions of law as to the basis for a permanent injunction. *See, e.g., Rinfret*, 2020 WL 6559411, at *1 (issuing default judgment permanently enjoining defendant from future violations of the federal securities laws, in reliance on the complaint's allegations); *see also S.E.C. v. Cobalt Multifamily Investors I, LLC*, No. 06-CV-2360, 2011 WL 4889093, *2 (S.D.N.Y. Oct. 13, 2011) (granting the Commission's motion for default judgment and permanently enjoining defendant from future violations of anti-fraud and other provisions).

The allegations of the Complaint establish that Cattlin schemed with the Pages and with Shupe fraudulently to acquire and sell shares in violation of Sections 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. His scheme included deceptive acts taken in order to defraud investors by disguising the sale of stock held by, or on behalf of, the Pages, who were public company affiliates. Among other acts, Cattlin: (1) as CEO of Cyberfort and BioHemp, took direction from the Pages and acted for their benefit, thereby helping the Pages hide the fact that they controlled those companies; (2) coordinated with the Pages to provide false and misleading information in response to Commission inquiries; (3)

failed to disclose the Pages' beneficial ownership in Blake's 10-K; (4) oversaw the issuance of stock to various nominee entities controlled by the Pages; and (5) facilitated the Pages' control over Cyberfort's press releases. *See* Dkt. No. 1, ¶¶1, 7, 71-73, 75, 77, 80-83, 100-103, 116-125.

Second in the permanent injunction factors, Cattlin acted knowingly and intentionally and therefore acted with a high degree of scienter. Cattlin operated as the Pages' inside man at Cyberfort and BioHemp and facilitated their secret control of those companies. *See id.*, ¶¶3, 67-69. For example, Cattlin oversaw the issuance of stock to various nominee entities controlled by the Pages. *See id.*, ¶¶80-83, 100-103. In his role as officer and sole Director of Blake, Cattlin caused Blake to execute a 1-for-1,000 reverse split of its stock. Virtually eliminating the Blake stock held by small stockholders other than the Pages through this reverse split enabled the Pages to control virtually the entirety of the float, the company's purportedly unrestricted stock that was available for trading. *See id.*, ¶72. Control of the of the float allowed the Pages to control the supply of stock, which in turn allowed them to control the volume available for sale and thereby secretly control the market price per share and volume when they eventually dumped their stock on unsuspecting investors. *See id.* During 2018 and 2019, Cattlin failed to disclose to investors the Pages' beneficial ownership interest in Blake's stock. *See id.*, ¶75. Finally, though Cattlin knew that Blake was funded by the Pages, he asked the Pages and others how they should respond to Commission inquiries regarding who funded Blake, showing he knew that the Pages' intent was to conceal their relationship to Blake. *See id.*, ¶71b.

Third, Cattlin was the inside man acting at the Pages' behest at two separate companies. *See id.*, ¶¶1, 3. In that capacity, Cattlin caused both companies to undertake numerous actions for the Pages benefit. *See id.* His conduct was the opposite of isolated. Cattlin's actions, including the issuance of stock to Page nominee entities, was critical to the overall scheme and

between June 2018 and July 2019, allowed the Pages to dump over 4 million shares of Cyberfort

and BioHemp stock for illegal proceeds of approximately $5.5 million.  *See id.*, ¶¶92-93, 131-

133.

Fourth, Cattlin, has not appeared in this action and therefore has failed to recognize his

wrongful conduct or provide any assurances against future misconduct.

Fifth, Cattlin served as the chief executive officer of both BioHemp and Cyberfort and

accordingly has chosen a career where he might be in a position that may provide an opportunity

for further violations.

**III.    The Evidence Supports the Disgorgement and Prejudgment Interest Requests.**

   **A.      Disgorgement and Prejudgment Interest Should be Ordered.**

Exchange Act Sections 21(d)(5) and 21(d)(7) authorize courts to order disgorgement in

Commission enforcement actions.  15 U.S.C. §§78u(d)(5), and (d)(7); *Liu v. S.E.C.,* 140 S. Ct.

1936, 1940 (2020) ("[A] disgorgement award that does not exceed a wrongdoer's net profits and

is awarded for victims is equitable relief permissible under [15 U.S.C.] §78u(d)(5).").[3]  Courts

have broad equitable power to order the disgorgement of ill-gotten gains obtained through

violations of the federal securities laws.  *See S.E.C. v. Fowler*, 6 F.4th 255, 265 (2d Cir. 2021);

*S.E.C. v. Contorinis*, 743 F.3d 296, 306–07 (2d Cir. 2014).  Disgorgement "is not designed to

compensate victims or to punish wrongdoers, but is instead meant to deter wrongdoing by

forcing a defendant to give up the amount he was unjustly enriched."  *S.E.C. v. Amerindo Invest.

Advisors, Inc.*, No. 05-cv-5231, 2014 WL 2112032, *4 (S.D.N.Y. May 6, 2014) (internal

quotations and citations omitted).  "The paramount purpose of . . . ordering disgorgement is to

---

[3] On January 1, 2021, Congress enacted the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 ("NDAA"), which includes the disgorgement provision since codified at 15 U.S.C. §78u(d)(7).  The NDAA applies to "any action or proceeding that is pending on, or commenced after" January 1, 2021.  *Id.* §3501(b).

make sure that wrongdoers will not profit from their wrongdoing." *S.E.C. v. Tome*, 833 F.2d 1086, 1096 (2d Cir. 1987) (quoting *Commonwealth Chem.*, 574 F.2d at 102). Disgorgement only needs to be a "reasonable approximation of profits" caused by the violation, and the wrongdoer should bear the risk of any uncertainty in determining the amount of disgorgement. *See Fowler*, 6 F.4th at 267; *S.E.C. v. Patel*, 61 F.3d 137, 139–40 (2d Cir. 1995).

The Commission also seeks prejudgment interest. The purpose of ordering payment of prejudgment interest is to deprive the wrongdoer of the benefit of "what amounts to an interest free loan procured as a result of illegal activity." *Rinfret*, 2020 WL 6559411, at *6 (citations omitted); *see also Contorinis*, 743 F.3d at 308 (prejudgment interest can be awarded in addition to disgorgement to deprive a defendant of the time value of money). As with the award of disgorgement, the Court has broad discretion whether to grant prejudgment interest and what rate to use for calculation. *See First Jersey,* 101 F.3d at 1476–77 (using IRS underpayment rate because it "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from [his] fraud"); 17 C.F.R. §201.600(b) (Commission Rules of Practice state that prejudgment interest is computed at IRS underpayment rate, compounded quarterly). Prejudgment interest is calculated "for the entire period from the time of the defendants' unlawful gains to the entry of judgment." *First Jersey,* 101 F.3d at 1477.

### B. Cattlin Should Disgorge Proceeds Derived From Illegal Stock Sales.

The Pages' sales in violation of the antifraud provisions of the securities laws and the registration provisions of Section 5 generated millions in trading proceeds. *See* Dkt. No. 1, ¶¶1, 93, 133. Cattlin was paid $107,140 from the Pages' illegal stock sale proceeds. *See id.*, ¶137. Those proceeds must be disgorged as ill-gotten gains. *S.E.C. v. de Maison*, No. 18-2564, 2021

WL 5936385, 82 (2d Cir. Dec. 16, 2021 (summary order) (upholding disgorgement that was a reasonable approximation of net profits). The $107,140 Cattlin was paid by the Pages, directly or indirectly, for serving, on their behalf, as an officer or director of BioHemp and Cyberfort, was derived from the Pages illegal sales of stock. *See* Dkt. No. 1, ¶137. Cattlin should pay disgorgement of $107,140, broken down by year as follows: $19,200 for proceeds in 2017, $7,000 for proceeds in 2018, $66,470 for proceeds in 2019, and $14,470 for proceeds in 2020. The Commission intends to distribute the funds collected from Cattlin, in combination with any fund recovered from other related defendants, to harmed investors if it is feasible to do so.

### C. Cattlin Should Be Ordered to Pay Prejudgment Interest at the IRS Underpayment Rate.

By virtue of the time value of money, Cattlin received an additional benefit from controlling the proceeds of the scheme he received, and he should be obligated to repay this amount. *S.E.C. v. Lek Sec. Corp.*, No. 17-cv-1789 (DLC), 2020 WL 1316911, *4 (S.D.N.Y. Mar. 20, 2020) ("an award of prejudgment interest may be needed in order to ensure that the defendant no enjoy a windfall as a result of its wrongdoing"). The Commission proposes the use of the IRS underpayment rate, compounded quarterly and has computed prejudgment interest using this method. The prejudgment interest on the proceeds earned for each year was calculated separately, assuming (favorably to Cattlin) that all of the trading proceeds were received on the last day of the year in which they were earned. The ending date for the prejudgment interest calculation was May 31, 2022. *See* Ex. 1 (prejudgment interest reports showing calculations by year for Cattlin's disgorgement).

Applying this method produces prejudgment interest for Cattlin in the following amounts:

| 2017 | 2018 | 2019 | 2020 | TOTAL |
|---|---|---|---|---|
| $ 5,047.37 | $ 1,432.17 | $ 9,346.40 | $ 1,391.68 | $ 17,217.62 |

Thus, Cattlin should be ordered to pay the following amounts for disgorgement and prejudgment interest combined:

| 2017 | 2018 | 2019 | 2020 | TOTAL |
|---|---|---|---|---|
| $ 24,247.37 | $ 8,432.17 | $ 75,816.40 | $ 15,861.68 | $ 124,357.62 |

## IV.    The Court Should Order Cattlin to Pay a Civil Monetary Penalty of $207,183.

Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act authorize the Court to order civil monetary penalties for securities fraud violations. *See* 15 U.S.C. §§77t(d); 78u(d)(3). The statutes provide for three "tiers" of penalties, which increase based on the seriousness of the violation. Third-tier penalties, the highest tier, require a showing that the underlying violations involved "fraud, deceit, manipulation, or deliberate or reckless disregard of the law" that "directly or indirectly result in substantial losses or create a significant risk of substantial losses to other persons." 15 U.S.C. §§77t(d); 78u(d)(3).

Cattlin enabled the Pages to disguise their actions while dumping stock into the market through various nominees yielding millions of dollars in illegal stock sale proceeds. *See* Dkt. No. 1, ¶¶1, 93, 133. Because Cattlin knowingly or recklessly engaged in fraudulent conduct that at the very least created a significant risk of substantial investor losses, as the Complaint alleges, the Court should impose a third-tier penalty on Cattlin. For violations occurring after November 2, 2015, the third-tier penalty amount for natural person is the greater of $207,183 per violation or the gross amount of the defendant's pecuniary gain from each violation. *See* 15 U.S.C. §§77t(d)(2)(C); 78u(d)(3)(B)(ii); 17 C.F.R. §201.1001(b); Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (as of January 15, 2023), *available at* https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm. Cattlin's receipt of ill-gotten gains that is described in the Complaint and detailed in the

disgorgement analysis contained in Section III above relates solely to calendar years 2017 to 2020, which is all in the period after November 2, 2015. *See* Dkt. No. 1, ¶137.

District courts in the Second Circuit have looked to the following factors, many of which overlap with the factors for permanent injunctive relief, to determine the reasonableness of a penalty: 1) the seriousness of the violations; 2) the defendant's scienter; 3) the repeated nature of the violations; 4) whether the defendant has admitted wrongdoing; 5) the losses or risk of losses caused by the conduct; 6) any cooperation provided to enforcement authorities; and 7) ability to pay. *See S.E.C. v. Verdiramo,* No. 10 Civ. 1888, 2013 WL 57823, *3 (S.D.N.Y. Jan. 7, 2013); *see DiBella*, No. 3:04-cv-1342, 2008 WL 6965807, *6 (D. Conn. Mar. 13, 2008). Given Cattlin's critical role in an egregious and long-running fraudulent scheme, and the factors discussed in Section II above, the Court should impose the maximum civil monetary penalty on Cattlin. A third-tier penalty of $207,183 is appropriate because as CEO, Cattlin held a position of public trust at two separate companies and in that role acted with a high degree of scienter in furthering the fraudulent scheme to dump millions of dollars of stock on unsuspecting investors. *See* Dkt. No. 1, ¶¶3, 67-69, 71b, 72, 75, 80-83, 100-103.

## V. The Court Should Bar Cattlin from Participating in Any Offering of a Penny Stock.

Under Section 20(g) of the Securities and Section 21(d)(6) of the Exchange Act, courts have the authority to bar any person from participating in an offering of a penny stock if that person was participating in the offering of a penny stock at the time of the misconduct. *See* 15 U.S.C. §§77t(g); 78u(d)(6). A "person participating in an offering of penny stock" includes "any person engaging in activities with a broker, dealer or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock." 15 U.S.C. §§77t(g)(2); 78u(d)(6)(B). A "penny stock" is defined in Section 3(a)(51) of the Exchange Act

and in Rule 3a51-1 thereunder as equity securities that do not meet certain exemptions (essentially many stocks that do not trade on a national securities exchange and that trade under $5 per share and whose issuers do not meet certain thresholds of tangible assets or revenue). *See* 15 U.S.C. §78c(a)(51).

As set forth above, a penny stock bar is an equitable remedy that courts are empowered to order. *See, e.g., S.E.C. v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 429–30 (S.D.N.Y. 2007). "The standard for imposing such a bar essentially mirrors that for imposing an officer-or-director bar." *Id.* at 429; *see Patel*, 61 F.3d at 141 (standard for imposing an officer or director bar includes: "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.") (internal quotations omitted). As shown in the charts below, all of the stocks whose trading was part of the scheme identified in the Complaint were penny stocks within the Exchange Act's definition.





Further, Cattlin was "participating in an offering of penny stock" when he, on behalf of BioHemp and Cyberfort, oversaw the issuance of stock to various nominee entities controlled by the Pages. *See* Dkt. No. 1, ¶¶80-83, 100-103.

The factors summarized above—including the egregiousness and repeat nature of Cattlin' knowing misconduct from which he profited by over one hundred thousand dollars, and his failure to appear in this case and identify any information that would suggest that he will not engage in this type of fraud again—demonstrate that the Court should bar Cattlin from any further participation in the offering of penny stocks to deter his continuation of misconduct in this area. *See* Dkt. No. 1, ¶¶3, 67-69, 71b, 72, 75, 80-83, 100-103, 137.

## VI. The Court Should Bar Cattlin from Serving as an Officer or Director of a Public Company.

Section 21(d)(2) of the Exchange Act authorizes courts to "prohibit, conditionally or unconditionally, and permanently or for such period of time as it shall determine, any person who violated Section 10(b) of this title … from acting as an officer or director of an issuer that has a class of securities registered pursuant to Section 12 of this title or that is required to file reports pursuant to section 15(d) of this title if the person's conduct demonstrates unfitness to serve as an officer or director." 15 U.S.C. §78u(d)(2).

In determining whether to impose an officer and director bar, a court may consider the following factors: "(1) the 'egregiousness' of the underlying securities law violations; (2) the defendant's 'repeat offender' status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter' (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *S.E.C. v. Shkreli*, No. 15-cv-7175 (KAM), 2022 WL 541792, at *2 (E.D.N.Y. Feb. 23, 2022) (quoting *Patel*, 61 F.3d at 141). As noted above in determining whether a penny stock bar is appropriate, these factors weigh in favor of

barring Cattlin from serving as an officer and director of public companies.

No part of the judgments the Commission seeks has been paid.

**CONCLUSION**

For these reasons the Commission respectfully requests that this Court enter a default judgment against Cattlin in the form of the proposed default judgment filed herewith as a separate docket entry.

Dated:  May 12, 2023                          Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its Attorneys,

/s/ Nita Klunder
Kathleen B. Shields
Nita K. Klunder
33 Arch Street, 24th Floor
Boston, MA  02110
Telephone: (617) 573-8904 (Shields); (617) 573-8800 (Klunder)
Fax: (617) 573-4590
Email: shieldska@sec.gov; klunderni@sec.gov

**Certificate of Service**

I certify that on May 12, 2023, this memorandum was filed electronically with the Court. The filing will be sent to the registered participants as identified on the Notice of Electronic Filing and may also be accessed through the Court's ECF system.  We will also send this to Cattlin at his last known address via FedEx and regular mail.